BLANK ROME LLP
Attorneys for Plaintiff
Jeremy J.O. Harwood (JH 9012)
LeRoy Lambert (LL 3519)
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HOPE SHIPPING CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> TRANS SEA TRANSPORT N.V., <br> Defendant. | 08 Civ. 7237(GEL) <br><br> **AMENDED VERIFIED COMPLAINT** |

Plaintiff HOPE SHIPPING CO., LTD. ("Plaintiff"), as Owner of the M/V IST, by

its attorneys Blank Rome LLP, complaining of the above-named Defendant TRANS SEA

TRANSPORT N.V. ("Defendant"), alleges upon information and belief as follows:

1.      This is a case of admiralty and maritime jurisdiction, as hereinafter more

fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of

the Federal Rules of Civil Procedure. The Court has subject matter jurisdiction.

2.      At all material times, Plaintiff was and now is a foreign company organized

and existing under the laws of Malta  and the owner of the Motor Vessel IST (the

"Vessel").

3.     At all material times, Defendant was and now is a corporation organized and existing under the laws of Curacao.

## THE BASIC FACTS

4.     Plaintiff chartered its Vessel to Defendant under a contract of charter party dated September 23, 2003 (the "Charter"). A copy is Exhibit 1 to the accompanying Rule B affidavit.

5.     Plaintiff paid cargo interests for a shortage of cargo caused by stevedore pilferage and for damage caused by the stevedores.

6.     Pursuant to clause 40 of the Charter, the Interclub Agreement, Plaintiff by letter dated June 5, 2008 (Rule B Aff. Ex. 2) demanded indemnity from Defendant in the sum of $225,000.

7.     Defendant has refused to pay the sum that it owes.

8.     The Charter is subject to English law and London arbitration.  Plaintiff has nominated an arbitrator.  This action is expressly filed without prejudice to that right of arbitration.

## COUNT I

## RULE B RELIEF

9.     Plaintiff repeats paragraphs 1 through 8 as if fully set forth herein.

10.     Plaintiff seeks issuance of process of maritime attachment so that it may obtain security for its claims including its English attorneys' fees and arbitrators' fees which are routinely awarded in London arbitration and no security for Plaintiff's claim has been posted by Defendant or anyone acting on its behalf to date.

11.    At best as can now be estimated, Plaintiff expects to recover the following amounts in the arbitration:

| | | |
|---|---|---|
| A. | On the principal claim | $225,000 |
| B. | Estimated Recoverable English Lawyers and Arbitrators' Fees & "Costs" | $250,000 |
| C. | Interest over the course of 3 years at prime rate average of 8% per annum: | $ 54,000 |
| | **TOTAL:** | $529,000 |

12.    Defendant cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"), but is believed to have, or will have during the pendency of this action, assets in this jurisdiction.

**WHEREFORE,** Plaintiff prays:

A.    That process in due form of law issue against Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.    That since Defendant cannot be found within this District pursuant to Rule B, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all of Defendant's tangible or intangible property or any other funds held by any garnishee, which are due and owing to Defendant up to the amount of $529,000 to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to Rule B, answer the matters alleged in the Verified Complaint;

C.    That this Court retain jurisdiction over this matter through the entry of a judgment or award associated with the pending claims including appeals thereof.

D.    That Plaintiff may have such other, further and different relief as may be just and proper.

Dated: New York, NY
      August 19, 2008

Respectfully submitted,
BLANK ROME LLP
Attorneys for Plaintiff

By _____

LeRoy Lambert (LL 3519)
405 Lexington Avenue
New York, NY 10174
Tel.: (212) 885-5000

## VERIFICATION

STATE OF NEW YORK   )
: ss.:
COUNTY OF NEW YORK   )

LeRoy Lambert, being duly sworn, deposes and says:

1.    I am a member of the bar of this Honorable Court and of the firm of Blank Rome LLP, attorneys for Plaintiff.

2.    I have read the foregoing Complaint and I believe the contents thereof are true.

3.    The reason this Verification is made by deponent and not by Plaintiff is that Plaintiff is a foreign corporation, no officer or director of which is within this jurisdiction.

4.    The sources of my information and belief are documents provided to me and statements made to me by representatives of Plaintiff.

_____
LeRoy Lambert

Sworn to before me this
19th day of August, 2008

_____
Notary Public
KARL V. REDA
Notary Public, State of New York
No. 30-4783126, Qual. in Nassau Cty.
Certificate Filed in New York County
Commission Expires Nov. 30, 2009

BLANK ROME LLP
Attorneys for Plaintiff
Jeremy J.O. Harwood (JH 9012)
LeRoy Lambert (LL 3519)
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HOPE SHIPPING CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> TRANS SEA TRANSPORT N.V., <br><br> Defendant. | 08 Civ. 7237(GEL) <br><br> **AMENDED AFFIDAVIT UNDER SUPPLEMENTAL RULE B** |

STATE OF NEW YORK    )
                                              : ss.:
COUNTY OF NEW YORK  )

LEROY LAMBERT, being duly sworn, deposes and says:

1.    I am a member of the Bar of this Honorable Court and a member of the firm of Blank Rome LLP, attorneys for the Plaintiff herein. I am familiar with the circumstances of the complaint and submit this affidavit in support of Plaintiff's request for the issuance of process of maritime attachment and garnishment of the property of defendant TRANS SEA TRANSPORT N.V., a company organized and existing under the laws of Curacao, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

130484.00601/6661819v.1

2.      The defendant is not incorporated or registered to do business in this State.

3.      Under my supervision, my office did a search of the New York State Secretary of State, Division of Corporations, Transportation Tickler (2008 edition), telephone assistance in New York City, and the internet Yellow Pages.

4.      In our search, we did not find any listing or reference to defendant in this district or state.

5.      In the circumstances, I believe the defendants cannot be "found" within this district.

6.      I attach as Exhibit 1 hereto a copy of the charter party between plaintiff and defendant.

7.      I attach as Exhibit 2 a copy of plaintiff's U.K. counsel's notification of its claim for $225,000 under the "Interclub Agreement" contained in the Charter.

8.      Plaintiff has nominated an arbitrator.

_____
LeRoy Lambert

Sworn to before me this
19th day of August, 2008

_____
Notary Public

KARL V. REDA
Notary Public, State of New York
No. 30-4783126, Qual. in Nassau Cty.
Certificate Filed in New York County
Commission Expires Nov. 30, 2009

# EXHIBIT 1

AMBROKER
S. A.
SHIPBROKERS - CHARTERING  AGENTS - SALE & PURCHASE
PIAZZA N TOMMASEO, 1 - 34121  TRIESTE - PO BOX 814
TEL ( 040 ) 366966 (ACl43366G) TELEX 460219 & 460213  AMBROK
TELEFAX ( 040 ) 367310   Contact: E-Mai. A2STT95I

1

*Time Charter*

Government Form
Approved by the New York Produce Exchange
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1 *This Charter Party*, made and concluded in................CURACAO.................23RD day............of SEPTEMBER.........................................2003.....
2 Between..................................Jadroplov, Split Croatia as Managing.................................................................................................................................
3 Owners of the good......Croatian.........................Steamship/Motorship......................................MV " IST " ......of. See clause 50....
4 of..................tons gross register, and................................tons net register, having engines of.................................................indicated horse power
5 and with hull, holds, machinery and equipment in a thoroughly efficient state, and classed...Lloyd Register of Shipping.................................................................
6 at................of about....14.228.........cubic meter feet -bale grain capacity, available for cargo and about 8.478 metric.................................tons of  2240 lbs
7 deadweight capacity  (cargo and  bunkers,  including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,
8 allowing a minimum of fifty tons) on a draft of...............feet..............inches on ....Summer freeboard, inclusive of permanent bunkers,
9 .. see clause 50.................tons of fuel and capable of steaming, throughout currency of this Charter Party fully  laden under good weather
10 conditions about..13.....knots on a consumption of about..24.5...tons IFO 180 CST + ABOUT 1.3 MT MGO of best Welsh  coal best grade fuel oil best grade
Diesel oil.

11 now. See Clause 50 )...............................................................................................................................................................................................................
12 ...............................and ........Trans Sea Transport N.V.,..............................Charterers of the City of....WILLEMSTAD, ..CURACAO..............................................
13 *Witnesseth*, That the  said  Owners  agree  to let, and the said Charterers agree to hire the said vessel, from the time of delivery in direct continuation , for
14 about...6 months chopt further 6 months more or less 30 days t/c period via sp(s), sb(s), sa(s), in/out geo rotation, AWIWL (Charterers option to breach
IWL paying normal extra insurance risk, if any, against Owners prior consents which will not be unreasonably withheld), always afloat except Naabsa
river Plata and Buenaventura, where it is customary for vessel of similar size and type, with lawful merchandise and harmless merchandise only.
Declaration of Charterers option for second period to be declared latest 5 ( five ) months upon commencement of the New Charter Party.

15 ..................................................................................................................................................................within below mentioned trading limits,
16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining  responsible  for
17 the fulfilment of this Charter Party. Acceptance of delivery by Charterers shall not constitute any waiver of  Owners' obligations hereunder.
18 Vessel to be placed at the disposal of the Charterers, see cl. 76 at..................................................................................................................................................

19.......................................................................................................................................................................................................................................................
20 in such dock or at such wharf or place  (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as
21 the Charterers  may direct. If such dock, wharf or  place be not available time to count as provided for in clause No. 5.  Vessel on her delivery to be
22 ready in every way to receive and carry any permissible cargo and to be maintained in such condition during the entire currency of this Charter Party to
receive  cargo with clean-swept holds, see clause 53, and tight, staunch, strong and in every way fitted  for the service, having water ballast,
winches  and

23 donkey boiler with sufficient steam power, or if not equipped  with donkey boiler, then  other  power sufficient to run all the winches at one and the same
24 time (and with full complement of officers, seamen, engineers and firemen for  a vessel  of her tonnage),  to be employed, in carrying  lawful  merchan-
25 dise,  including petroleum or its products, in proper containers,  excluding.....See clause 59.....................................................................................................

2

26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
27 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports it—British—North
28 America, and/or—United—States—of—America,—and/or—West—Indies,—and/or—Central—America,—and/or—Caribbean—Sea,—and/or—Gulf—of—Mexico,—and/or
29 Mexico,—and/or—South—America .........See Clause 74. ................................................................................................................................and/or—Europe
30 and/or—Africa,—and/or—Asia,—and/or—Australia,—and/or—Tasmania,—and/or—New—Zealand,—but—excluding—Magdalena—River,—River—St.—Lawrence—between
31 October—31st—and—May—15th,—Hudson—Bay—and—all—unsafe—ports;—also—excluding—when—out—of—season,—White—Sea,—Black—Sea—and—the—Baltic,
32 within trading limits, always within I.W.L. always afloat, always via safe port(s), berth(s), anchorage(s), place(s), excluding see clause 74,
33 The Charterers have the option of breaching I.W.L. against paying additional premium as per invoice from Owners' underwriters.
34 Such permission to be granted by the Owners before such trading (see also Clause 25)................................................................................................
35 as the Charterers or their Agents shall direct, on the following conditions:
36    1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew, shall pay for the
37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
38 the vessel in a thoroughly efficient state in hull, holds, machinery and equipment for—and—during—the—service with certificates necessary to comply with current
   requirements at ports of call for and during the service.
39    2. That whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Compulsory
   watchmen/compulsory garbage removal, Pilotages, Torres Strait and Coral Sea, East Coast of Australia, Inland Japanese Sea, Agencies, Commissions,
40 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated but when the vessel puts into
41 a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners.     Fumigations ordered because of
42 illness of the crew or cargoes carried prior to delivery to be for Owners' account.     Fumigations ordered because of cargoes carried or purported to be
   carried or cargoes visited or purported to be visited while vessel is employed under this
43 charter to be for Charterers' account. All other fumigations to be for Charterers' account after vessel has been on charter for a continuous period of
44 of six months or more. All necessary costs for accommodation and victualling of vessel's personnel ashore due to fumigation to be borne by party
   accountable for fumigation.
45    Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46 Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers—to—have—the—privilege—of—using—shifting—boards
47 for—dunnage,—they—making—good—any—damage—thereto.
48    3. That—the—Charterers,—at—the—port—of—delivery,—and—the—Owners,—at—the—port—of—re-delivery,—shall—take—over—and—pay—for—all—fuel—remaining—on
49 board—the—vessel—at—the—current—prices—in—the—respective—ports,—the—vessel—to—be—delivered—with—not—less—than ................................tons—and—not—more—than
50 ................................tons—and—to—be—re-delivered—with—not—less—than ................................tons—and—not—more—than .................................. tons.   See Clause 37.
51    4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of USD 5,500 per day/pr for the period 6 + 6
   months more or less 30 days in chopt.
52 .........................United States Currency per day including overtime, see cl. 76 ten—or—vessel's—total—deadweight—carrying—capacity,—including
   bunkers—and
53 stores,—on ................................summer—freeboard,—per—Calendar—Month, commencing on and from the day of her delivery, as aforesaid, and at
54 and after the same rate for any part of a day month; hire to continue until the hour of the day of her re-delivery in like good order  and condition ordinary
55 wear and tear excepted, to the Owners (unless lost) at—DLOPS 1SP FULL MED INCL ADRIATIC/B.SEA, CONTINENT, (SKAW/GIBRALTAR RANGE),
   GIB-LOME RANGE, CAPE TOWN-DURBAN RANGE, TAMPA-B.AIRES INCLUDING CARIBS RANGE, AND OR IN CHARTERERS OPTION SPORE/S.JAPAN
   RANGE AGAINST COMPENSATION OF USD 48,000.- TO THE OWNERS PAYABLE WHEN IT BECOMES OBVIOUS THAT VESSEL WILL BE REDELIVERED
   TO SPORE/S.JAPAN RANGE....................................................................................................................................................................................................

3

56 ..............................................................unless otherwise mutually agreed. Charterers are to give Owners not less than **30/15/10/7/5 days**

**approximate and 2/1 days definite.**

57 notice of vessels expected date of re-delivery, **and name of last discharging port.**

58 5. Payment of said hire to be made as per Clause 56 in New York in cash in United States Currency, semi-monthly **(15 days)** in advance, and

for the last half month or

59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61 hire, or bank guarantee, or on any breach of this Charter Party, Owners to give Charterers 3 working days notice by telex in which to remedy the

**situation, failing which** the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~

63 ~~following that no which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterer, they~~

64 ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65 Cash for vessel's ordinary disbursements at any port may be advanced as required by the **Captain** Owners by the Charterers or their Agents,

subject

66 to 2 1/2 % commission and such advances shall be deducted from the hire. The Charterers, however shall in no way be responsible for the application

67 of such advances.

68 6. That the cargo or cargoes be laden and/or discharged in any **safe dock** or at any **safe wharf or safe anchorage or safe place** that

Charterers or their Agents may

69 direct, provided the vessel can safely lie always afloat at any time of tide, except at such places in **River Plate/Argentina / Buenaventura,**

**Colombia** where it is customary for similar size vessels to safely

70 lie aground.

71 7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72 accommodations for Supercargo, if carried, shall be at the Charters disposal, reserving only proper and sufficient space for Ship's officers, crew,

73 tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow. Charterers~~

74 ~~paying Owners~~ .................**per day per passenger for accommodation and meals. However, it is agreed that in case any fines or extra expenses are**

75 ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense. No passengers allowed.~~

76 8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78 agency; and Charterers are to load, stow, **lash/unlash in holds and on deck if any, secure/unsecure and-trim, tally and discharge** the cargo at their

expense under the supervision of the Captain, who is to sign Bills of Lading for

79 cargo as presented, in conformity with Mate's and/or Tally clerk's receipts.

80 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82 10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the

84 rate of $~~1.00~~ **USD 12** per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85 Clerks, Stevedore's Foreman, etc., Charterers at the current rate USD 7 per meal, for all such victualling. Charterers to effect the insurances for as

**necessary for the supercargo or t/c representative on board and keep Owners fully indemnified for the case of an accident to the supercargo or t/c**

**representative.** ..................................................................................................................................................................

86 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88 terers, their Agents or Supercargo, when required, with a true copy of daily deck and engine Logs, showing the course of the vessel and distance run and the con-
89 sumption of fuel ( See Clause 47).
90      12. That the Captain shall use diligence in caring for the ventilation of the cargo.
91      13. That the Charterers shall have the option of continuing this charter for a further period of .............................................................................
92      ...........................................................................................................................................................................................................................
93 on giving written notice thereof to the Owners or their Agents. ................ days previous to the expiration of the first named term, or any declared option.
94      14. That if required by Charterers, time not to commence before see cl. 76 .................................................................................and should vessel
95 not have given written notice of readiness on or before ................... but not later than .................... Charterers or
96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97      15. That in the event of the loss of time from deficiency and /or default of men or deficiency of stores, fire, breakdown or damages to
hull,
        machinery or equipment,
98 grounding, detention by average accidents to ship or cargo, dry docking for the purpose of examination or painting bottom, or by any other cause
99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra proven expenses shall be deducted from the hire.
102      16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105      The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.
107      17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to London, English law to
        apply. See Clause 61. three persons at New York.
108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.
110      18. That the Owners shall have a lien upon all cargoes, and all sub-freights, for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.
114      19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled in London according to York-Antwerp Rules 1974 as amended 1990, according
        to Rule 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
116 York-Antwerp Rules 1974 at such port or place in the United States as may be selected by the carrier and as to matters not provided for by these
117 Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
118 United States money at the rate prevailing on the date made and allowances or damage to cargo claimed in foreign currency shall be converted at
119 the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
120 bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121 or his agents may deem sufficient additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if

4

5

122 ~~required be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall at the option of the~~
123 ~~carrier be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125 ~~United States money.~~
126     ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~
132     Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.
133     20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the
134 cost of replacing same, to be allowed by Owners.
135     21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
136 convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
137 time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.
138 (See Clause 54)..........
139 .......................................................................................................................................................................................................
140     22. ~~Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
141 ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts. Owners are to provide necessary gear for~~
142 ~~same, otherwise equipment and gear for heavier lift shall be for Charterers' account.~~ Owners also to provide on the vessel sufficient light as on
      board ~~lanterns and oil for~~
143 night work ~~and vessel to give use of electric light when so fitted, but any additional lights over these on board to be at Charterers' expense.~~ The
144 Charterers to have the use of any gear on board the vessel.
145     23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;
146 steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,
147 deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
148 port, or labour unions, prevent crew from driving winches, shore Winchmen to be employed and paid by Charterers. In the event of a disabled winch or winches, or
149 insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and extra expenses including standby
      expenses and pay any loss of time occasioned
150 thereby.
151     24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153 etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154 of which are to be included in all bills of lading issued hereunder:

### U.S.A. Clause Paramount

155
156     This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158 any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159 be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

**Both-to-Blame Collision Clause**

160
161 ~~if the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of or damage to or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~
167    25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging. **The vessel has no ice class, therefore she will not force ice nor to follow ice-breaker.**
170    26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers.  The owners to remain responsible for the
171 navigation of the vessel, **acts of pilots and tugboats,** insurance, crew, and all other matters, same as when trading for their own account.
172    27. A commission of ~~2.5 per cent is payable by the Vessel and Owners~~........ .......................................................
174 on hire earned and paid under this Charter, and also up on any continuation or extension of this Charter.
175    28. An address commission of ~~2.5~~ 3.75 per cent payable ~~to~~............plus **1.25 per cent to Ambroker S.rl**...............on the hire earned and paid under
this Charter.

Attached rider Clauses making reference to preamble Charter Party and enclosing Clauses 29-76 inclusive, together with the Baltime 1939 War Risk Clause, New Both
– to Blame Collision Clause and New Jason Clause, as well as a description clause are deemed to be fully incorporated in this Charter Party.

..................................            ..................................
        **OWNERS**                                    **CHARTERERS**

This computer generated Charter Party is a precise and true copy of the NYPE (revised 3rd October, 1946) form. Modifications, additions, insertions, deletions
have been made in line with mutual agreement. Characters of additions and insertions are clearly highlighted by different size font and printed in bold and italic letters.
Deletions are marked by striking through the original characters .

6

**29.**

With reference to Clause 8 of this Charter Party, " customary assistence" shall mean all types of work which the Master and crew would normally do when the ship is trading for the Owners' account such as, but not limited to:

a) All opening and closing of hachtes in preparation for loading and discharging, if permitted by local authorities.

b) Closing and opening of hatches in the event of weather which may adversely affect condition of cargo carried on board during loading and discharging.

c) Shifting ship during loading and/or discharging and shifting berth.

d) Officers and crew to shape up vessel's hatches as much as possible prior to arrival and at loading and/or discharging operations provided shore regulations permit.

The Master shall take care of, to the best of his ability all gear, equipment, and/or stores supplied to the vessel by or for the Charterers' account and the Master shall keep a record of all such gear, equipment and/or stores so supplied. The Master to maintain same good condition. Such gear, equipment and / or stores to be redelivered to the Charterers prior to redelivery of the vessel to the Owners or if required by the Charterers, at the time during the Charter in like good order and condition as supplied (normal wear and tear excepted). The Owners shall make good any shortage and/or damage unacconted for.

**30.**

The Master shall supervise the stowage of the cargo throughly and let one of his Officers control all the loading, handling and discharging of the cargo and he is also to furnish the Charterers with stowage plan for each cargo.

**31.**

It is understood that the Master will authorise the Charterers or their Agents to sign the Bills of Lading on his behalf strictly, but in accordance with Mate's , and/or Tally Clerk's receipts, New Jason Clause, New Both-to-Blame Collision Clause, Conwartime 1993, Bimco Scrap Metal Clause, together with the Chamber of Shipping Clause Paramount to be included in all Bills of Lading signed under this Charter Party.

**32.**

Owners are obliged to deliver and keep the vessel, her crew and anything pertaining hereto supplied with up-to-date and complete certificates and approvals of equipment enabling the vessel and crew to load, carry and discharge any permissible cargo under this Charter Party, and to bunker within the trading limits allowed under this Chartere Party. The Master to be responsible for bunkering,

1

and it is the responsibility of the Master and the Owners (provided that the Charterers have given adequate notices) to arrange for any special vaccination required at ports of call and to keep on board corresponding valid certificates. Failing the above any time lost and extra expenses to be for the Owners' account.

## 33.

The Charterers are not to be responsible for stevendoring and other damage to the vessel unless notified in writing by the Master at time of occurrence of damage. The Master has to co-operate with the Charterers and Agents in givin prompt notice of claim in writing to party causing damage. Hidden damage to be reported as soon as discovered, but not later than on completion of discharge. Any damage effecting seaworthiness and cargo worthiness to be repaired prior to departure from the port of occurrence, at the Charterers' time, risk and expense, any other damages to be repaired by crew or workshop at Charterers expenses against original vouchers'.

Charterers not to be responsible for any stevendore damages to the vessel, which to be settled directly between stevendores and Owners. Charterers to assist and to co-operate for settlements.

If vessel seaworthiness/cargoworthiness/trading capability affected such repairs to be effected prior sailing port of occurrence to the satisfaction of vessel's classification society at stevendores expense and Charterers' time. Charterers to remain ultimately responsible.

Providing Owners do not settle directly with stevendores. Master not to fail to notify Charterers' agents in writing or by cable of any damage occurred latest within 36 hours of occurrence except for hidden damages in which case Master to notify Charterers upon discovery, but in any case prior to redelivery of the vessel.

The Charterers shall have the liberty to deliver the vessel without repairing the dmages for which the Charterers are responsible, as long as same does not effect the seaworthiness/cargoworthiness/trading capabilities but Charterers undertake to reimburse costs of repairs against the production of repair bills by repairers or dockyard unless otherwise agreed.

## 34.

The Owners guarantee the vessel to be always safe in ballast without requiring any solid ballast.

## 35.

If any misrepresentation has been made regarding the description of the vessel and/or her position, and/or itinerary both prior to and after loading, the Charterers have the right to claim compensation for any loss resulting therefrom.

## 36.

In lieu of cleaning holds of the vessel on redelivery the Charterers have the option of paying the Owners US$ 3.000 - lumpsum for cleaning holds only. The disposal and dismantling of bunkheads and ventilators and/or dunnage, mats and debris to be arranged by the Charterers at their expenses and in their time, if demanded.

Intermediate hold cleaning to be arranged by time Charterers on their risk, time and expenses but preference to be given to local labour and water pollution regulations, and crew's daily duties. It is understood that failure to pass inspection at loading port(s) will not be considered as a breach of Owners' responsibility, and vessel to remain on hire.

2

**37.**

Bunkers on delivery to be about 380-430 metric tons IFO and about 25-40 metric tons MDO. Charterers to redelivery with bunkers as onboard but sufficient to reach nearest bunkering port. Bunkers prices both ends to be US$ 167 per metric ton IFO and US$ 225 per metric ton MDO, same quantity / prices on redelivery as on delivery

Charterers' option to: bunker the vessel enroute or simultaneously with the vessel's discharge operations at the last discharge port prior to delivery or to pay a value of estimated consumption bunkers to be remitted together with first hire payment.

Upon delivery or after arrival at the first port after delivery and upon redelivery or at the last port(s) before redelivery, the Owners and the Charterers are to hold a joint on-hire and off-hire survey by a single independent survey for joint account to ascertain the vessel' s condition and quantity by bunkers. On –hire survey to be in the Owners' time if during off-hire survey vessel's commercial operations are not obstacled, no hire will be deducted , and off –hire survey to be in Charterers' time.

Owners have the option to bunker the vessel prior redelivery provided same does not interfere with Charterers' operation of the vessel.

**38.**

The Charterers have the option to deduct from the last hire payment(s) estimated value of bunkers onboard on redelivery together with estimated Owners' disbursements, if any.

**39.**

The Owners warrant that the vessel has never called Cuba, to the best of their knowledge the vessel is not blacklisted by any Arab country nor any local unions due to previous trade. The Owners also warrant that the vessel is eligible for bunkering, and/or taking stores, provisions in all countries within trading limits. The Owners guarantee the vessel has not called at any Siberian or East Russian Port since March 1991.

**40.**

The Owners guarantee that the vessel is entered for Part One cover (which the Owners confirm fully covers Cargo Claim) and shall remain entered so during the currency of this Charter Party in a P and I Association. Any liability to third parties for cargo claims shall be borne by the Owners/Time Charterers in accordance with the Inter Club Nype Agreement dated September 1996 , and any alterations/amendments/additions which may be imposed thereto. The party having paid the claim shall submit same to the other party with supporting documents as soon as possible. Neither party shall between themselves refer to the one year limit as defence. Neither party shall grant time extensions to third parties without having obtained the other party's prior consent. Name of the Owners' P and I Club: ~~West of England~~ "Standard Steamship Owners P&I Association Ltd". Charterers P and I Club: The Charterers Mutual.

## 41.

Deleted

## 42.

Should the vessel put back whilst on voyage by reason of an accident or breakdown, or in the event of loss of time whether in port or sea or deviation upon the course of the voyage caused by sickness of or accident to the crew or any person on board the vessel (other than passengers travelling by request of the Charterers) or by reason of the refusal of the Master or crew to perform their duties, the hire shall be suspended from the time of the inefficiency until the vessel is again efficient in the same or equivalent position and voyage resumed therefrom, and all extra expenses incurred including bunkers consumed during the period of suspended hire shall be for the Owners' account.

## 43.

After suspension of hire from any cause for which the Owners are responsible, the vessel to be placed again at the Charterers'disposal at the same port or place or position or equivalent position where the hire was suspended and time on hire to be accordingly prolonged at the Charterers' discretion. If the vessel has been off-hire except time for dry-docking for a total period of 30 days during this Charter Party, the Charterers have the option to cancel the balance of the Charter Party, provided the vessel is empty.

## 44.

The Owners/Master to give notice on fixing and 7/5/3 days approximate notice of redelivery, and 48/24 hours definite notice of same.

## 45.

a) The Owners undertake that the vessel will be furnished with a certificate of evidence of Financial Responsibility as required under the United States Water Quality Improvement Act of 1970 and any amendments thereto. In no case shall the Charterers be liable for damage as a result of the Owners' failure to obtain said certifivate.

b) It is understood that the vessel will comply with safety regulations and/or requirements in effect at all ports of calling. A particular reference is the United States Department of Labour Safety and Health Regulations set forth in part III of the Federal register. It is agreed that

Should the vessel not meet safety rules and regulations, the Owners will take immediate corrective measures and any stevedore standby time and/or other expenses involved will be for the Owners' account.

## 46.

The Owners guarantee that prior to presentation of the vessel and for the duration of this Charter Party , the minimum terms and conditions of employment of the crew of the vessel are now or will

4

be, covered by an I.T.F. Agreement or a bona fida trade union agreement acceptable to the I.T.F. Any loss of time and expenses caused to the Charterers due to delay of the vessel or interference with the Charterers' use of the vessel due to strikes or labour (Union's or workers) manifestations or stoppage in any form of boycott on account of the vessel's manning or wage pattern, or her previous trading, to be for Owners' account. Understood th vessel is Register of Shipping (Russia). Owners guarantee that the vessel to maintain Russian flag, registry and same ownership during the duration of this Charter Party period.

**47.**

The Charterers or their supercargo to have access to engine room, bridge and cargo holds of the vessel, provided that this does not interfere with the ship's daily operation.

Furthermore, at any stage of this Charter Party the Charterers' representative(s) shall have free and unlimited access to all the vessel's holds, deck and engine logbooks, tank hold plans, calibration scales, and/or other plans as requested, but to the extent that concerns Charterers' interests for the period agreed.

**48.**

The Charterers have the option of adding any off-hire time(s)to the maximum period under this Charter Party.

**49.**

Charterers to pay US 1,000 PMPR for cables and entertainments.

**50.**

Description of the vessel: ·
(All details about)

**M/V "IST"**
ex "Nymphaea"

```
Flag:  ................................................  Croatian
Owner:  .........  Hope Shipping Company Limited, Valletta, Malta
Managing Owner/Operator:  ................  Jadroplov Split/Croatia
Call Sign:          ................................     9AIU
IMO/Lloyd's Register No.:  ............................  8024923
Off.No.:  .............................................   14928

Class:
Croatian Register     -   Hull * 100 Al - 1 - BULK CARRIER - ESP
                      -   Machinery * M1
Lloyd Register of Shipping  - 100Al Bulk Carrier - ESP LMC
Built by "Imabari Shipbuilding Co.Ltd." -  ............ June 1981
```

                    Bulk carrier Logger, Grain fitted

5

```
Deadweight:     ........................ 24,030  Kt - Draft  9.947 m
Lumber    :     ........................ 25,305  Kt - Draft 10.335 m
TPC       :     ........................ 32,92 MT/cm on Summer draft
Gross/Nett:     .................................. 14,228/8,478
Length Over All: ..................................    160.38 m
Breadth Mld:     ..................................     24.60 m
Depth Mld:       ..................................     13.60 m

SUEZ Canal Gross/Nett:   ...............   14,892.84/12,830.50 RT
PANAMA Canal Gross/Nett: ...............   15,487.00/12,011.07 RT

Hold/Hatches:  ............................................  4/4

Cargo Gear: ..........................  1 x 25 tons derricks boom
            ..........................  3 x 25 tons crane
```

Crane pedestal height from main deck 8.40 metres.
Crane outreach from ship's side at 25 degrees from horizontal 8 m
- Derrick 3.5 m
Crane slewing speed 0.7 RPM - luffing time: 39 secs

```
           Crane hoisting speed basis
           25 MT            18.5 M/Min
           15 MT            27.0 M/Min
            5 MT            55.0 M/Min
           Light            62.0 M/Min
```

Type of steel hatchcover: Jack-Knife MacGregor Steel type.

Main Engine placed Aft
Mitsubishi 7 UEC 52/125 h,
Mr 9.300 Ps x 150 RPM
Nor 8.370 Ps x 145 RPM

Speed and Consumption:

- abt 13.00 kts on abt 24,5 mt IFO(180 CST) plus abt 1.3 mt Marine
Gas Oil at sea, abt 2.8 mt Marine Gas Oil at port all gear
working,
abt 1.2 mt Marine Gas Oil  Idling.

Vessel burns Marine Gas Oil when starting main engine,
manoeuvring, passing narrow passages and confined waters.

MAIN / AUX. ENGINES FUEL GRADE TO MEET INTERNATIONAL
FUEL STANDARD

MAIN ENGINE:
          ISO 8217:1996; RME 25 STANDARD
With inclusive Amendments:
- CCAI max. ..................................  870
- ENERGY CONTEND min. ........................  40 MJ/kg
```

- FUELS TO CONTAIN NO WASTE LUBRICANTS OR CHEMICALS

AUXILIARY ENGINES:
                    ISO 8217:1996; DMA STANDARD

In case of any dispute the fuel quality will be analyzed by licensed authorized service acceptable for both parties and their findings shall be binding.

Bunker Capacities: abt  ....... 1,203.54 Kt IFO / 130.28 Kt MGO

Ballast Capacity: abt  .............................. 6430.95 Kt

Freshwater Capacity: abt  ........................... 428.84 mt

Fresh water production/cons: Vessel has evaporator, daily output
                    7/8 T - consumption 7 tons

Hatchcover Strengths:  ...............  2.40 Mtons per Squ.meters
Tanktop Strengths:     ............... 10.64 Mtons per Squ.meters
Upper deck Strengths:  ...............  3.30 Mtons per Squ.meters

Size on Hatches all in metres:

```
No.1  18.40 x 12.80 m
No.2  20.00 x 12.80 m
No.3  20.00 x 12.80 m
No.4  20.00 x 12.80 m
```

All holds are free from obstructions(except for hold access ladders)
and suitable for grab discharge.

Vessel no cargo battens fitted.

Dimension of Holds (all figures abt):

| Holds | Length | Width on top tank | Height from top tank to | |
|-------|--------|-------------------|-------------|------------|
|       |        |                   | Main deck   | Top of H/C |
| No.1  | 27.80 m | 4.70 F 19.70 A   | 12.00 m     | 13.60 m    |
| No.2  | 28.00 m | 19.90 F 20.70 A  | 12.00 m     | 13.60 m    |
| No.3  | 27.80 m | 20.70 F 20.60 A  | 12.00 m     | 13.60 m    |
| No.4  | 29.40 m | 20.50 F 10.20 A  | 12.00 m     | 13.60 m    |

7

Cargo holds capacity (equivalent used 1 cbm = 35.315 Cbf)

| H o l d | G     R     A     I     N | | B     A     L     E | |
|---------|------------|------------|------------|------------|
|         | CBM        | CBF        | CBM        | CBF        |
| No.1 Hold | 6727.72  | 237.589.43 | 6387.97  | 225.591.16 |
| No.2 Hold | 8199.62  | 289.569.58 | 7805.04  | 275.634.99 |
| No.3 Hold | 8203.59  | 289.709.78 | 7808.50  | 275.757.18 |
| No.4 Hold | 8102.44  | 286.137.67 | 7838.19  | 276.840.99 |
| G. Total | 31233.37 | 1103.006.46 | 29840.70 | 1053.024.32 |

Deck timber lashing:

Vessel is fitted with stanchions and side lashings, but instead chain, transverse lashings consist of wire FI 20 mm and turnbuckles as per attached scheme.

Distance from water line to top of H/C full ballast condition:
(all figures about)

| No.1 12.40 m |
|--------------|
| No.2 12.00 m |
| No.3 11.50 m |
| No.4 11.00 m |

Height from ship's keel to top of the mast abt 44.46 metres.
Height on Summer Draft to top of the mast abt 34.50 metres.
Height on ballast condition to top of the mast abt 39.50 metres.

Hull and Machinery value US$ 3,5 Mio.

Vessel fully fitted for Australian trading
Vessel not Lakes fitted
Vessel has Australian Hold ladders
Vessel is not CO2 fitted in holds
Vessel has natural hold ventilation
Vessel is grain fitted and approved for grain loading with .
dispensation for untrimmed ends
Vessel has collapsible steel stanchions 48 pieces 6.5
(No.1)
7.0 M (No. 2,3,4)

* 8

```
        Number  of  height  permanent  stanchions  30  pieces  6.5  M
(No.1)
        7.0 (No. 2,3,4)
        Vessel not able load full DWT cargo with one hold empty
        Vessel not strengthened for heavy cargo
        Constants 250 MT excluding fresh water

P & I Club:
" The Standard Steamship Owners' P & I Association Ltd ", London

Vessel is member of "Seafarer's and Docker's Union of Croatia"
accepted by ITF

Certificate of Financial Responsibility (Water pollution):
                    Cert. No. : 104314 08
                Date of expire: 02.10.2005

            International Safety Management (ISM) Code
            Issued by "Croatian Register of Shipping"
      Cert. No.: 09-000237/090178, valid until 5th April 2005


Satcom :
        Inmarsat "mini M"    Phone : 762 184 590/93
                             Fax   : 762 184 591
        Inmarsat "C"        Telex : 423 819 310
```

## 51.

The vessel has hoppered holds, wih no frames extending down to tanktops. The holds have no obstacles, obstructions, pillars wood in holds and on tanktops, is free of corrugations and has no cargo battens. The vessel's tanktop is steel, strengthened and suitable for grab discharge. The Charterers to havethe privilege of using bulldozers with rubber wheels' in the vessel's holds, however, unit weight of bulldozers including cargo carried not to exceed the vessel's tanktopstrength.

## 52.

The Owners confirm the vessel is fitted for carriage of grain in accordance with Chapter IV of Solas 1974 and amendments without requiring bagging/strapping and securing when loading a full cargo (deadweight) of heavy grain in bulk with ends untrimmed but always in accordance with vessel's 'grain loading plan with trim and stability calculations' and local regulations.
The Owners confirm the vessel is self – trimming.

Charterers option to fumigate cargo in-trnsit at their cost/time. Such fumigation to be strictly in accordance with regulations of USDA,IMDG CODE and/or local load port authorities. But always in accordance with IMO and IMDG CODE regulations.

In case cargo is fumigated with methyl bromide crew to be placed ashore unless local authorities declare it safe and normal for crew to stay on board during such fumigation but always in accordance with IMO and IMDG CODE regulations.

## 53.

The vessel to be presented on her delivery for loading with holds proprely swept, washed dry clean and ready in every respect to load any permissible cargo.

If the vessel is finally found not to be ready in all respects to load above, at first port of loading after her delivery, the actual time lost from the discovery therof until she is in fact ready to load shall be cosidered as off-hire.

## 54.

Deleted.

## 55.

Any delay and/or expenses or fines incurred on account of smuggling by the vessel's crew / officers to be for the Owners' account.

## 56.

Hire to be paid to:
>       HOPE SHIPPING CO. LTD, VALETTA, MALTA
>       ACC.NO. 7095-6950337
>       WITH SPLITSKA BANKA D.D., SPLIT, CROATIA
>       SWIFT: SPLI HR 2X
>       THROUGH THEIR ACCOUNT WITH THE BANK OF NEW YORK, NEW YORK, USA
>       SWIFT CODE IRVTUS3N

~~SUN MARITIME LIMITED, VALLETTA, MALTA~~
~~ACC. NO. 7095-6950345~~
~~WITH SPLITSKA BANKA D.D.,SPLIT, CROATI~~
~~SWIFT:SPLI HR 2X~~
~~THROUGH THEIR ACCOUNT WITH THE BANK OF NEW YORK,~~
~~NEW YORK, USA~~
~~SWIFT CODE: IRVTUS3N~~
~~REF: HIRE M/V HOPE 1 / TST~~

## 57.

It is understood that speed and consumption given in the vessel's description are in force only under "good weather conditions", which are defined as the wind not exceeding force 4 and the Douglas Sea State 3 Degrees according to Beaufort Scale.

Charterers' option to route/monitor vessel using "Marincom/Montreal". In case of performance claims, Marincom's report to be final and binding.

## 58.

The Charterers shall not be responsible for loss of life nor personal injury or arrest or seizure of loss of damage to the vessel, her cargo and/or other objects arising from perils insured against by customary policies of insurance.

## 59.

Vessel to be employed in carrying lawful harmless merchandise only, which have to be loaded/stowed/discharged strictly in accordance with IMO and local regulations and code of safe practice for solid bulk cargoes.

Following cargoes to be always excluded:

Livestock, Injurious, inflammable dangerous hazardous goods, such as acids, ammonium nitrate ( fertilizer grade is allowed), ammonium sulphate, ammunitions, arms, asbestos, asphalt, bitumen in bulk, bones, borax, calcium carbide, calcium hydroxide, calcium hypochlorite, canary seeds, carbide, carbon black, caustics soda, charcoal, chloride of lime, copra or its products, corrosives, creosoted goods, direct reduced iron ore pellets, expellers, explosives, ferro silicon, fishmeal, gypsum, hides, hooves, iron briquettes, iron ore briquettes, iron sulphate, meat bone meal, motor blocks, motor spirit, naphtha, needle coke, nigerseed expellers, nuclear fuels or substances, oilcakes, pencil pitch, petroleum coke, petroleum or its products, pitch, ponds solids, pyrites, quebracho extracts, quicklime, radioactive products or waste, railway wagons, resin, rice bran, salt to be mutually discussed according to grade/quality and type of holds protection,shaving, silica send, spent oxide, sponge iron, sulphur, tar or any of itsproducts, tobacco, turnings, turpentine or its products, war materials of any kind, wheat bran.

Time and expenses for IMO/IMDGS regulations and/or local regulations in any port to apply and extra insurance if any to be for Charterers account.

It has been agreed that following cargo are allowed:

Cargo of scrap, in pieces of max a few hundred kilos, non-radioactive (certificate to be handed to the Master prior commencement of loading).

Shredded scrap, HMS −1, HMS-2 (non oily and excluding M/B and turning), pig iron (soft landing at Master's satisfaction), petcoke cargo of cement,copper concentrates and petcoke not to be last cargo under this Charter Party.

Calcinated petcoke is allowed.

## 60.

If the Charterers have reason to be dissatisfied with the performance of the vessel, the Owners upon receiving complaints shall immediately investigate and take appropriate steps to correct the situation.

## 61.

Arbitration.

11

All disputes arising out of this contract which cannot be amicably resolved shall be reffered to Arbitration in London.

Unless the parties agree upon sole arbitrator the reference shall be to 2(two) arbitrators, one to be appointed by each of the parties. The arbitrators shall be commercial men, and the Umpire, if appointed, shall be a legal man, and shall be members of the London Arbitrators' association or otherwise qualified by experience to deal with commercial shipping disputes.

The contract is governed by English law and there shall apply to arbitration proceedings under this clause the terms of the London Maritime Arbitrators' Association current at the time when the arbitration proceedings are commenced.

It is further agreed that the 7 (seven) days limit for appointment of the Arbitrator, either originally or by substitution, shall be changed to 30 (thirty) days.

In the event the amount of claim and counter-claim does not exceed US\$ 50.000 – the parties agree to refer any dispute to a sole arbitrator in accordance with the "LMMA SMALL CLAIMS PROCEDURE 1989".

## 62.

The Charterers to have full cargo rights on deck always within the Master's discrecion in accordance with Department of Trade and Industry or the equivalent authorityregulations at loading port ot ports. In the event of any dispute arising in connection with deck cargo, the vessel's Classification Society ruling to be final as to seaworthiness and suitability.

All uprights and lashing etc., for deck cargo are to be supplied by the Charterers except for gear provided by the Owners. All Bills of Lading issued for deck cargo to be claused in respect of such cargo, "Carried on deck at Shippers' risk withouot responsibility for loss or damage howsoever caused" or if from and to USA or its territories "Carried on deck at Shippers' risk as to perils inherent in such carriage but in all other respects subject to the provisions of the United States carriage of goods by Sca Act 1936".

Sufficient notice of intent to load a deck cargo to be given to the Owners/Master to enable them to call for a surveyor to supervise deck cargo loading plan at the Charterers' expense.

## 63.

If steel cargo or bagged agri-products are loaded then the Owners/Charterers to appoint a mutually agreeable P and I Club surveyor to perform preshipment and outturn survey and cost of preshipment and outturn cargo condition surveys to be equally shared between the Owners and the Charterers. The survey for bagged agri-products to take place only if they are available and visible prior to shipment otherwise the preshipment survey to be performed just prior to loading.

## 64.

should the vessel, on her last voyage under this Charter Party, be delayed and the maximum charter period thereby exceeded, the Charterers shall have the use of the vessel to enable them to complete the voyage. Hire for such excess period to continue at the rate stipulated in Clause 4 provided the

12

delay is not caused by reasons which are reasonably foreseeable at the time the Charterers gave order for the last voyage, otherwise a new hire to be discussed and agreed failing which the Owners to retain all legal rights.

## 65.

The vessel to provide on board General Arrangement Plans, Trim Tabls/Scale etc., and the Owners always to remain solely responsible for the correctness of same.

The vessel has on board valid Grain Loading Booklet in accordance with Solas 1974 Regulation and IMCO Regulations 264 (VIII) as adapted in 1974 and later amendments.

## 66.

The Charterers have the option to double bank the vessel. However, the Charterers are obliged to provide sufficient tender/protection to the Master's satisfaction. The Owners are not to be responsible for loss or damage to cargo by reason of this method of loading/discharging . Bimco Double Banking Clause to apply.

## 67.

If so required by the Time Charterers, the vessel may be ordered to load from or discharge into a seasoning vessel alongside at a recognised safe lightering place inside or off port. The Charterers to provide adequate fenders and lines for the operation, always subject to the Master's approval. Bimco Double Banking Clause to apply.

## 68.

Oil Pollution

a) If the Owners are required to establish or remain financial security or responsibity in respect of oil or other pollution damage to enable the vessel lawful to enter, remain in or leave any port, place, territorial or contiguous waters of any country or states in performance of this Charter Party, the Owners shall make all arrangements by bond or otherwise may be necessitated to satisfy such requirements at the Owners' sole expense.

b) The Charterers shall be under no responsibility for all consequences ( including loss of time) of oil or other pollution damage and any failure or inability of the Ownersto do so as provided for the above and any loss of time incurred thereby shall be off-hire.

c) The Owners shall idemnify the Charterers harmless against all consequences (including fines, if any, imposed to the Charterers) of oil or other pollution damage and any failure or inability of the Owners to do so as provided for in the preciding paragraph a). In connection with the precedig paragraph a), a particular reference is made to a certificate of Financial Responsibility in compliance with requirements of the U.S. Water Quality Improvement Act of 1970 and any amendments therto.

d) For the purpose of the avoidance of misunderstanding, both the Owners and the Charterers confirm that the Owners shall be in no event exonerated from the responsibility for all

13

consequences of oil or other pollution damage and any failure or inability of the Owners to do so as provided for in paragraph a) even in case such oil or other pollution and Owners' failure or inability would occur because of (1) any incident (s) of those enumerated in Clause 16 as mutually excepted and/or (2) any other incident(s)/cause(s) whatsoever may allow the Owners to invoke the exempion/ limitation of their liability under this Charter Party and laws.

## 69.

Weather routing.
The Charterers may supply for their own account an Independent Weather Routing Company's advise to the Master during the voyages specified by the Charterers. The Master shall comply with all the reporting procedure of the routing service selected by the Charterers. However the decision as to final route selection to be at the Master's discretion.

## 70.

Shoul Bills of Lading not arrive discharge port in time or should the Charterers wish to change destination for whole part of the cargo, the Charterers may request the Owners to discharge the entire cargo without presentation of original Bills of Lading, and the Charterers hereby state that they shall indemnify the Owners against all consequences arising from the Owners conforming to the Charterers' request in discharging cargo without original Bills of Lading. The Charterers to issue single Letter of Guarantee to the Owners in accordance with Owners' P and I Club wording and the Letter of Guarantee to be faxed to the Owners.

## 71.

If war or actual hostilities break out between any two or more of the following countries: United Kingdom, Russia, U.S.A., France, People's Republic of China, Japan, Norway, both the Owners and the Charterers shall have the right to cancel this Charter provided no cargo o/b'. It is understood that war or actual hostilities means war or hostilities directly between these nations and does not include local hostilities or civil war where any of the above countries supports opposing sides.

## 72.

Any extra War Risk Insurance over and above the Owners' basic coverage including blocking and trapping, and Crew bonus due to the vessel trading to restricted areas to be for the Ccharterers' account.

## 73.

Should the vessel be arrested during the currency of this Charter Party at the suit of any person and/or party having or purporting to have a claim against or any intererst in the vessel, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remains unemployed as a result of such arrest, i.e., the state of arrest having no bearing on hire unless the vessel be prevented from working thereby. If and when the vessel is off-hire under this clause, cost of any extra fuel consumed in consequence thereof and all direct extra expenses are to be for the Owners' account, always provided above is not by default of the Charterers.

14

**74.**

The vessel shall be employed in such lawful trades as the Charterers or their agents shall direct excluding Abkhazia, , Cambodia, Cis Far East Ports, , Cuba, Eritrea, Etiophia, Falkland Islands, Haiti, Iran, Iraq, Israel and Israelian controlled territories, Kuwait, Lebanon, Liberia, Myanmar, North Korea, Somalia, Sri Lanka, Syria, Timor, Turkish occupied Cyprus, or any war or war like zones as declared by Lloyd's of London. No direct trade between PR China and Taiwan.

Bngladesh is permitted but due to piracy in region of bangladesh, Charterers will arrange sufficient number of arned watchment (not less than 6 guards) on their account during vessel's call at Bangladesh.

Sea of Azov ( ok during ice period but once same is over don't see problems).

West Africa countries like Angola, Congo, Sierra Leone and Zaire, to be allowed only with Owners' prior approval which to be reviewed on a case by case basis.

## OWNERS ADDITIONAL CLAUSES

A) Compass recalibration

In the event of the vessel's compass having to be recalibrated due to the use of electro magnets for either loading or discharging, then same to be for Charterer's time and expenses.

B) Charterers' Agent

It is agreed that the Charterers agent at port of call will take care of routine Husbandry matters including minor crew medical attention, water supply, crew mail, etc.

## BIMCO STANDARD I.S.M. CLAUSE

From the date of coming into force of the International Safety Management (I.S.M.) Code in relation to the vessel and thereafter during the currency of this charter party, the Owners shall procure that both the vessel and the "company" (as defined by the I.S.M. Code) shall comply with the requirements of the I.S.M. Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to the Charterers. Except as otherwise expressly provided in this charter party, loss, damage, expense or delay caused by the failure on the part of the Owners or the "company" to comply with the I.S.M. Code shall be for the Owners' account.

## BIMCO STANDARD SCRAP METAL CLAUSE

A) Cargo for the purpose of this Clause shall mean scrap metal, excluding metal borings, shavings and turnungs. The Charterers shall instruct the Terminal Operators or their servants to load the cargo, in accordance with, where appropriate, Annex 9 of the IMO Code of Safe

15

Practice for Cargo Stowage and Securing.Compliance with the provisions of Annex 9 of the above mentioned IMO Code shall not affect the counting of laytime.

In the event that the Charterers, the Terminal Operators' or their servants do not comply with the provisions of (a) the costs for any damage caused to the Vessel as a result thereof

B) and any time spent repairing such damage affecting laytime shall be for the Charterers' account.

C) All claims for damage referred to under (b) above shall be reported by the Master to the Charterers or their agents in writing within 24 hours of the occurrence or, as soon as the damage could reasonably be expected to have been discovered by the exercise of due diligence without prejudice to the Charterers' liability. The Master shall use his best endeavours to obtain written acknowledgment by the responsible party causing the damage in the meantime.

## NEW BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:-

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier." The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contract.

The Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

General Average and New Jason Clause.

General Average shall be made payable according to the York/Antwerp Ruls 1974, amended 1990, but where the adjustment is made in accordance with law and practice of the United States of America the following clause shall apply:

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which the Carriers is not responsible by statute, contract or otherwise, the goods, Shippers or Consignees or Owners of the goods shall contribute with the Carrier in General

16

Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be or incurred and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said ship or ships belonged to strangers. Such deposit, as the Carriers or his Agents may deem sufficient, to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made-by the goods, Shippers or Consignees or Owners of the goods to the Carriers before delivery.

## BIMCO Standard War Risks Clause for Time Charters, 1993
## Code Name: "CONWARTIME, 1993"

(1)For the purpose of this Clause, the words:

    (a) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

    (b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2)    The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be,

    or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3)The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against the vessels of certain flags or ownership, or against certain cargoes or

    crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(4)(a)  The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

    (b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being

17

subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such

bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6) The Vessel shall have liberty:-

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or

any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(b) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d) to divert and discharge at any port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(e) to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clause (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

18

## ~~BALTIME-WAR RISKS CLAUSE~~

~~A) The Vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war hostilities, warlike operations, act of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or State whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler.~~

~~B) Should the Vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks,~~

> ~~1) the Owners to be entitled from time to time to insure their interests in the Vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand; and~~
> ~~2) hire to be paid for all time lost including any lost owing to loss or injury to the Master, Officers, or Crew or to the action of the Crew in refusing to proceed to such zone or to be exposed to such risks.~~

~~C) In the event of the wages of the Master, Officers and/or Crew or the cost of provisions and/or stores for deck and/or engine room and/or insurance premiums being increased by reason of or during the existence of any of the matters mentioned in section A) the amount of any increase to be added to the hire and paid by the Charterers on production of the Owners' account therefor, such account being rendered monthly.~~

~~D) The Vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the Vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such orders or directions.~~

~~E) In the event of the nation under whose flag the Vessel sails becoming involved in war, hostilities, warlike operations, revolution, or civil commotion, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the Vessel to be redelivered to the Owners at the port of destination, or if prevented through the provisions of section A) from reaching or entering it, then at a near open and safe port at the Owners' option, after discharge of any cargo on board.~~

~~F) If in compliance with the provisions of this clause anything is done or is not done, such not to be deemed a deviation.~~

19

# EXHIBIT 2

Beaufort House  15 St Botolph Street  London EC3A 7NJ
tel +44 (0)20 7247 2277  fax +44 (0)20 7071 9000
DX 155 London CDE

For the attention of Mr Russell Crumplin
Sach Solicitors
24 Alie Street
London  E1 8DE

| | |
|---|---|
| your ref | |
| our ref | 11411-5/JDF/LXH/3.68 |
| direct tel | 020 7643 7067 |
| direct fax | 020 7071 |
| e-mail | Jdulow@blg.co.uk |
| | lhickson@blg.co.uk |
| date | 5 June 2008 |

Dear Sirs

### MV "IST" at Cotonou on 15.06.2005 & Bissau on 04.07.2005 - ICA claim

1    Following our exchanges of 11, 12 and 19 March, and as advised, the Owners proceeded to settle the cargo claim on best terms. We are pleased to report that they were able to negotiate a 15% discount on the amount of the French Court's judgment (the "Judgment").

2    Pursuant to the Interclub Agreement ("ICA") incorporated by clause 40 of the charterparty, the Owners claim an indemnity from the Charterers for the amount of the settlement being €71,500 and US$56,231 plus the cost of defending the cargo claims in the sum of US$55,398.33. At current rates of exchange the total claim is equivalent to US$225,000. We attach as Exhibit 1 copies of the supporting documents in this regard.

3    The Owners liability to cargo interests arises out of shortage of and damage to a cargo of bagged rice. As you know, under the ICA liability is apportioned with reference to the cause of the loss and, in this regard, we refer you to the Judgment and, where necessary, to the discharge survey reports. We have previously provided you with a translation of the Judgment.

### Shortage

4    The cause of the shortage is clear and accordingly Owners had no defence on causation in the French proceedings. It follows that the Judgment does not deal with causation in its findings.

5    The cause of the shortage was pilferage on the part of stevedores and, in this regard, we attach as Exhibit 2 copies of the discharge survey reports for both Cotonou and Bissau (see pages 3 and 4 of tab A and page 13 of tab B). You will note that the pilferage was considerably more extensive and organised at Bissau and hence the shortage claim at Bissau is approximately 20 times greater than the shortage at Cotonou.

6156664

www.blg.co.uk
Barlow Lyde & Gilbert LLP or an affiliated undertaking has an office

Barlow Lyde & Gilbert LLP is a limited liability partnership, registered in England and Wales with registered number OC325641  It is regulated by the Solicitors Regulation Authority. The term

## Damage

6       The cause of the mould damage was determined by the French Court as:

6.1     insufficient insulation/protection (i.e. kraft paper/matting) of the cargo from the consequences of "sweat";

6.2     the cargo being stowed in direct contact with the hatch covers; and

6.3     the cargo being stowed into the hatch combing area thereby reducing the effectiveness of the ventilation. (see pages 7 and 8 of the Judgment).

7       The Judgment made reference to a surveyor's comment that there may have been inadequate ventilation. We have investigated this possibility and attach as Exhibit 3 a copy of the Vessel's ventilation records from which you will note that, subject to fumigation requirements and rain, the ventilation hatches were opened with reference to temperature and dew point in accordance with accepted procedure. Ventilation can therefore be excluded as a possible cause of the damage.

## ICA apportionment

8       In relation to the shortage element, the claim clearly falls within the second leg of ICA clause 8(c), the Stevedores being the servants/sub contractors of the Charterers for the purpose of the discharge. In relation to the damage element, the claim clearly falls within ICA clause 8(b). In the circumstances Owners are entitled to a 100% indemnity from the Charterers.

9       Please therefore may we have your confirmation within 21 days that the Charterers will indemnify Owners in full in relation to the amounts mentioned at paragraph 2 above.

## Security

10      If Charterers are unable to provide the requested confirmation then the Owners will require security for the claim plus interest and costs. In those circumstances, please may we have your confirmation that the Charterers agree in principal to provide security subject to agreement on wording and amount.

## Other issues

11      You previously suggested that your client had chartered the Vessel from Jadroplov and not the owner of the Vessel, Hope Shipping, and accordingly Hope Shipping has no contractual nexus with your client and would therefore be unable to claim an indemnity from them.

12      Our clients have confirmed that Hope Shipping are the registered owners of the Vessel and Jadroplov are its managers. This is made clear at clause 50 of the charterparty, in the Judgment and on Jadroplov's website. As is common charterparty practice, Jadroplov signed the charterparty on behalf of the registered owners, Hope Shipping.

13    The position is clarified in the first addendum to the charterparty which refers to an agreement between Jadroplov as the Vessel's managers and Tran Sea Transport as the Vessel's charterers.    For your ease of reference we attach a copy of the first addendum as Exhibit 4.

14    It is beyond any doubt that Jadroplov signed the charterparty as agents of Hope Shipping and the charterparty is therefore between your clients and Hope Shipping.

15    In any event, if Jadroplov operated the vessel as Owners (which is denied) it would be an implied term that they would indemnify the registered owner in respect of the consequences of their operating the vessel (i.e. any cargo claims) which would be a sufficient basis for them to claim an indemnity from your clients under the ICA.

16    Should you maintain your argument that there is no contractual nexus then our clients reserve their position to apply for a declaration and/or rectification of the contract with your client to pay the costs occasioned thereby on an indemnity basis.    Please therefore may we have your confirmation that you accept that the charterparty is between your clients and Hope Shipping.

17    We also attach as Exhibit 5 a copy of the front and reverse of the Bills of Lading as requested.

We look forward to hearing from you.

Yours faithfully

Barlow Lyle & Gilbert LLP

Barlow Lyde & Gilbert LLP

Encs